IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM D. DUREN, )
        Plaintiff, )
vs. ) Civil No. 17-cv-544-JPG-CJP
COMMISSIONER of SOCIAL SECURITY, )
        Defendant. )

## **MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), plaintiff William D. Duren seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### **Procedural History**

Plaintiff applied for benefits in September 2013 alleging disability beginning on December 31, 2011. After holding an evidentiary hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the application in a written decision dated April 22, 2016. (Tr. 19-37.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Plaintiff exhausted his administrative remedies and filed a timely complaint in this Court.

### **Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ failed to properly evaluate the opinion of his treating neurologist, Dr. Stephen Burger.

2. The ALJ applied an incorrect standard in assessing residual functional capacity (RFC) in that he found that plaintiff's pain and depression would cause "at least" moderate difficulties in mental functioning, but RFC is the most, not the least, the claimant can do.

3. The RFC assessment is not supported by substantial evidence because of the above two errors and because the ALJ failed to consider evidence that plaintiff would be off-task during the work day, and the ALJ failed to ask the vocational expert (VE) how he

determined the number of jobs available.

## **Applicable Legal Standards**

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the

2

claimant cannot, then the ALJ should find the claimant to be disabled. *Id*.; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He was insured for DIB only through December 31, 2016. He found that plaintiff had severe impairments of cervical and lumbar spine degenerative disc disease, osteoarthritis, diabetes, lower extremity peripheral neuropathy, right cubital tunnel syndrome, level 3 obesity, adjustment disorder with mixed anxiety and depressed mood, depressive disorder, and generalized anxiety disorder, which did not meet or equal a listed impairment.

The ALJ found that Mr. Duren had the RFC to perform work at the sedentary exertional level

3

with the ability to use a cane in the non-dominant upper extremity. He was limited to occasional balancing; frequent handling and fingering with the right upper extremity; no concentrated exposure to hazards; only rote or routine instructions or tasks that require little independent judgment or decision-making at a consistent pace over the course of the workday; no complex tasks; work in a task or object-oriented setting as opposed to a service-oriented setting; occasional contact with coworkers, supervisors, and the public; and work in a stable setting where there is little change in tools, processes, or the setting itself, and change, where necessary, is introduced gradually.

Based on the testimony of a vocational expert, the ALJ found that plaintiff could not do his past relevant work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

1. **Agency Forms**

Plaintiff was born in 1966 and was 45 years old on the alleged onset date. (Tr. 211.) He had a twelfth grade education. (Tr. 215.) He had worked as an ironworker and a deckhand on barges. (Tr. 203.)

Plaintiff submitted a Function Report in November 2013 in which he said that he basically spent the day watching TV or listening to music. He shifted between the couch, recliner and chaise. (Tr. 234.) He did some limited household chores. He had difficulty sitting for long periods of time and had trouble paying attention when he watched TV. (Tr. 237-38.) He had cramping in his legs and feet;

4

pain in his back, right arm, hand, wrist, legs and feet; numbness and swelling in his legs and feet; blurred vision in his right eye; shortness of breath; weakness in his legs; poor balance; fatigue; sensitivity to climate changes; anxiety; lack of motivation; trouble remembering, concentrating, and understanding; and medication side effects of diarrhea. (Tr. 239.) He was taking Metformin and Gabapentin. (Tr. 242.) He had difficulty using his hands due to pain and weakness. (Tr. 244.)

In January 2014, he reported that he was taking Neurontin for peripheral neuropathy, which caused diarrhea and trouble remembering. He was taking Norflex for pain, which caused drowsiness. (Tr. 253.) In August 2014, he reported that he had begun taking Zoloft for anxiety and depression, and this drug also caused drowsiness. (Tr. 288.)

2. **Evidentiary Hearing**

Mr. Duren was represented by an attorney at the evidentiary hearing in January 2016. (Tr. 36.)

Plaintiff's right wrist was surgically fused after a past work injury. He is right-handed. He testified that he had numbness and tingling in his right fingers and had no grip strength. He walked with a four-point cane. His primary problem was diabetes. He was diagnosed in 2007. His diabetes had progressed, and he was using two types of insulin. (Tr. 59-62.)

Plaintiff said he had numbness and pain in his feet. He could stand in one place for only five minutes. He could walk for about two hundred feet. He recently had ulnar nerve surgery because of numbness in two fingers, but they were still numb. (Tr. 63-65.) He had blurred vision because of his blood sugar. (Tr. 70.)

Plaintiff took Norco and Neurontin for pain. He had side effects of diarrhea, trouble remembering things, dry mouth, poor balance, and confusion. He fell asleep three or four times a day. (Tr. 67.)

5

Plaintiff took Zoloft for anxiety. It was prescribed by his primary care physician, Dr. Walls. He had panic attacks during which his heart would race. (Tr. 72-73.)

A VE also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment. The VE testified that this person could do the jobs of inspector and surveillance monitor. (Tr. 80-82.)

3.  **Medical Treatment**

In 2010, Dr. Stephen Burger, a neurologist, did an EMG and nerve conduction study on plaintiff's legs because of lower extremity pain and numbness. These studies showed evidence of neuropathy in both lower extremities. (Tr. 621-22.)

Plaintiff next saw Dr. Burger in August 2014 for worsening pain associated with diabetic peripheral neuropathy. Plaintiff was taking antidepressants, narcotics and Gabapentin. He told Dr. Burger that his balance had gotten worse and that he was using a cane. He had "some fluctuation in concentration" with his medications. On exam, Dr. Burger noted symmetric strength, bulk, and tone bilaterally. Coordination testing showed that he walked with a widened-base gait using a cane. He had impaired tandem gait. Finger-nose-finger and heel-to-shin maneuvers were slow but accurate. Sensory examination showed diminished light touch, pinprick, vibration, and proprioception in a stocking and glove distribution.[1] The diagnosis was diabetic peripheral neuropathy with neuropathic pain and sensory ataxia. Dr. Burger recommended supportive care, noting that if his pain gets worse, a multidisciplinary pain management program would be appropriate. (Tr. 607-08.)

Plaintiff returned to Dr. Burger in January 2016. Since the last visit, he had developed an infection in the right great toenail and had "drilled the nail himself" to relieve the pain. He was taking

---

[1] Proprioception is "perception governed by proprioceptors, as awareness of the position of one's body." http://www.dictionary .com/ browse/proprioception, (visited Mar. 15, 2018).

antibiotics. He said his balance was worse. The results of examination were essentially the same as on the prior visit. Dr. Burger counseled plaintiff that his treatment options were "quite limited." His pain was not getting worse, so he was not referred to pain management. Dr. Burger told him to continue to use his cane for his secondary sensory ataxia. He suggested that he be seen by a podiatrist. (Tr. 605-06.)

Dr. Ellen McDermott was plaintiff's primary care physician from February 2010 to July 2013. (Tr. 395.) The earliest office note is from January 2012. He had a history of diabetes, peripheral neuropathy, hypertension and hyperlipidemia. He was 5'9" tall and weighed 276 pounds. He was using two kinds of insulin, and he said his blood sugars were in good control. His son had recently died of a heroin overdose, and he was having a lot of anxiety, trouble sleeping, and irritability. Dr. McDermott had called in a prescription for ten Xanax several weeks prior, and they helped calm him down. The assessment was type 2 diabetes, hypertension, hyperlipidemia, and anxiety disorder/bereavement. Dr. McDermott prescribed a month's work of Xanax. (Tr. 373-74.) About a month later, plaintiff reported that his anxiety was slowly getting better. Dr. McDermott discontinued Xanax due to concern for dependence, and prescribed Ativan instead. Plaintiff had taken Ativan in the past. He was also to continue on his current medications for chronic leg pain/neuropathy. (Tr. 370.)

In March 2012, Dr. McDermott refilled a prescription for Hydrocodone. (Tr. 369.) Plaintiff was seen again for anxiety and depression in June and July. Dr. McDermott prescribed Celexa and put him back on Xanax. He was still having panic attacks. He lost his insurance and was concerned about not being able to pay for insulin. Dr. McDermott referred him to a social worker for assistance. An application for assistance was sent to Lilly Cares, a program that assists people with paying for some prescriptions. (Tr. 358-65.)

7

In October 2012, Dr. McDermott described his diabetes as "uncontrolled." He had not been taking Metformin. He was given a voucher to have this prescription filled. He had stopped taking Celexa because of headaches. He was still taking Xanax, sometimes three or four a day. He complained of burning in his extremities. (Tr. 354-57.) His diabetes was still uncontrolled in January 2013. He had burning in his legs and feet, which may improve with tighter blood sugar control. (Tr. 350-53.) His diabetes was described as "uncomplicated" the next month. (Tr. 344.)

In March 2013, plaintiff told Dr. McDermott that his leg pain was getting worse with more numbness and burning pain in his legs. He had more trouble keeping his balance. His blood sugars were controlled. Dr. McDermott recommended that he continue on his medications. She noted that he reported no major drug side effects. (Tr. 340-43.)

The last visit with Dr. McDermott was in July 2013. He was switching to Dr. Walls. She described him as stable and in "reasonable control of symptoms." Neurontin was helping his neuropathy somewhat, but he had heard that the assistance program was going to stop paying for it. His anxiety was stable. She refilled his Xanax. (Tr. 333.)

Dr. David Walls took over as plaintiff's primary care physician in October 2013. On the first visit, he found that sensation was intact to touch, pinprick, and proprioception. (Tr. 413-15.) In December 2013, plaintiff presented with neuropathy and anxiety. He was there "to discuss disability." (Tr. 447.) Dr. Walls saw him regularly through October 2015. Mr. Duren complained of a variety of problems, including anxiety, neuropathy, leg pain and cervical pain. Dr. Walls prescribed a number of medications, including Gabapentin, Norco, and Zoloft. (Tr. 431-58, 482-521, 533-50, 554-84.) Dr. Walls noted that his anxiety was "alleviated by medication." (Tr. 437, 574.) In December 2014, he had mild right ulnar neuropathy, but his hands were non-tender, and he had full strength in both upper

extremities. (Tr. 482-83.) The last visit with Dr. Walls was in October 2015. Plaintiff fell while sweeping up ladybugs in the house. He had right knee and ankle pain. He was using a cane. On exam, he had full strength and normal bulk and tone in both lower extremities. His right ankle was "benign." His right knee was bruised but was stable. The diagnosis was a contusion of the knee. (Tr. 582-84.)

Dr. Walls' records contain very few complaints of medication side effects. In March 2015, plaintiff said that Zoloft was making him too tired. However, in the "review of systems" section of that same note, he denied fatigue. (Tr. 537.) His prescription for Zoloft was renewed in June and September 2015. (Tr. 559, 576.) He again denied fatigue in September 2015. (Tr. 577.)

Plaintiff saw a urologist in March 2015 who noted that his gait was normal. (Tr. 532.)

Plaintiff saw Dr. Harvey Mirly, a hand surgeon, for his right ulnar nerve problem. Dr. Mirly did surgery in February 2015. (Tr. 523-28.) About eight days later, plaintiff told Dr. Mirly that he had relief of his pre-operative numbness and he was "quite pleased." (Tr. 598.)

### 4. Consultative Examinations

In December 2013, Dr. Adrian Feinerman performed a consultative physical exam. Plaintiff told Dr. Feinerman that he could walk for two hundred feet, stand for five minutes and sit for ten minutes. He said he was able to do fine and gross manipulation without difficulty. On exam, he was 5'8" tall and weighed 277 pounds. Ambulation was normal without an assistive device. His spine had a full range of motion. Straight leg raising was negative. There was no anatomic abnormality of any of the joints. Grip strength was strong and equal. Muscle strength was normal throughout with no spasm or atrophy. The range of motion of the right wrist was decreased. Fine and gross manipulations were normal. Sensory exam was normal using vibration, light touch and pinwheel. Plaintiff had moderate

difficulty in tandem walking and mild difficulty in standing on toes and heels and squatting and arising. He had no difficultly arising from a chair or getting on and off the exam table. Plaintiff's memory, concentration, and ability to relate were normal. (Tr. 419-30.)

James Peterson, Ph.D., performed a consultative psychological exam in January 2016. Plaintiff reported that he was still grieving the deaths of his father and his son. He was "very tearful" when talking about their deaths. He was taking Zoloft for depression. He reported that he had symptoms of panic and that he had feeling of disorientation and confusion when he was under stress. He had two to three panic attacks a week. Dr. Peterson diagnosed adjustment disorder with mixed anxiety and depressed mood. (Tr. 594-97) He completed a mental RFC assessment form. He said that plaintiff had moderate difficulty in understanding, remembering and carrying out complex instructions and in making judgments on complex work-related decisions. He had mild difficulty with regard to simple instructions. He was moderately limited in his ability to interact appropriately with the public, supervisors and co-workers, and in ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 591-93).

    **5.**    **Dr. Burger's opinion**

Dr. Burger assessed plaintiff's ability to do work-related activities by filling out a form at the request of plaintiff's counsel in September 2014. (Tr. 468-71.) He indicated that plaintiff could sit for five hours a day and could not stand or walk. He could not use either hand for pushing and pulling, fine manipulation, or repetitive motion tasks. He could not lift or carry any weight at all and could never reach above shoulder level. He suffered from fatigue which prevented him from working full time even in a sedentary job. In response to a request to describe the medical basis for plaintiff's pain, Dr. Burger wrote, "William Duren has diabetic peripheral neuropathy. This is painful as it effects [sic] all nerve

endings, but especially in feet. Pain, inability to balance oneself, and side effects from medicine are daily for William." Dr. Burger also indicated that pain and/or medication side effects caused moderate to severe interference with plaintiff's ability to maintain attention and concentration.

## **Analysis**

Plaintiff's first point is that the ALJ should have given more weight to Dr. Burger's opinion.

Obviously, the ALJ was not required to credit Dr. Burger's opinion even though he was a treating doctor; "while the treating physician's opinion is important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (internal citation omitted). A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)).

The ALJ is required to consider a number of factors in deciding how much weight to give to a treating doctor's opinion. The regulations refer to a treating healthcare provider as a "treating source." The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.*

(emphasis added). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not

inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he or she may "bend over backwards" to help a patient obtain benefits. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds that the ALJ did not err in rejecting Dr. Burger's opinion. ALJ Janney gave the opinion "little weight" because (1) it was not supported by objective findings; (2) it was not supported by plaintiff's statements to treatment providers; (3) it was not supported by documentation or clear articulation of the basis for the opinion; and (4) it was not consistent with other objective medical evidence. (Tr. 34.)

Plaintiff argues that Dr. Burger's opinion is supported by and consistent with the results of the nerve conduction study and his own examinations. Dr. Burger's examinations showed diminished sensation and an impaired gait. Plaintiff makes no attempt at all to explain how those findings would account for his opinion that plaintiff can never use either hand for pushing and pulling, fine manipulation, or repetitive motion tasks; could never reach above shoulder level; and could not lift or carry any weight at all. He also makes no attempt to explain how those findings would limit him to sitting for only five hours a day.

The ALJ pointed out a number of inconsistencies between Dr. Burger's opinion and other

12

evidence in the record. He noted that the record did not support a claim that plaintiff had ongoing hand and finger symptoms causing difficulty in grasping and holding objects. (Tr. 27.) He remarked on Dr. Feinerman's exam, which showed intact fine and gross manipulation with both hands, strong and equal grip strength, and full range of motion except for some limitation in the right (fused) wrist. (Tr. 29.) He had a normal gait when seen by the urologist in March 2015, in contrast to the gait he exhibited at Dr. Burger's office. (Tr. 30.) Further, the ALJ explained in detail how the record refuted the claim that plaintiff experienced medication side effects that were serious enough to interfere with his ability to concentrate and maintain attention to the degree indicated by Dr. Burger. (Tr. 32.)

It is well-established that an ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of another physician, internally inconsistent, or inconsistent with other evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007.) Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit Court of Appeals has characterized as "lax." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The Court finds that ALJ Janney easily met the minimal articulation standard here. Notably, this is not a case in which the ALJ failed to discuss evidence favorable to the plaintiff or misconstrued the medical evidence.

Plaintiff next argues that the ALJ used an incorrect legal standard in determining his mental RFC. The ALJ said he gave the opinion of Dr. Peterson, the consultative examiner, great weight. He remarked, "It is reasonable that his pain and depression would cause at least moderate difficulties." (Tr. 33.) Plaintiff argues that the RFC is the *most* that the claimant can do, not the *least.*

The problem with plaintiff's argument is that the ALJ made this observation in explaining why

he credited Dr. Peterson's opinion, and Dr. Peterson concluded that plaintiff had moderate difficulties in several areas of functioning. Dr. Peterson's opinion supplies substantial evidence to support the ALJ's mental RFC assessment. Plaintiff does not identify any evidence, other than his own subjective statements, to support a more limited mental RFC assessment. This also applies to his claim that the ALJ ignored evidence that he would be off-task during the workday. The ALJ was, of course, not obliged to accept plaintiff's subjective statements at face value, and plaintiff has not identified any error in the ALJ's assessment of the reliability of his statements.

Plaintiff's third point is simply a rehash of the first two points, plus a claim that the VE did not explain how he determined the number of jobs available. However, plaintiff did not object to or question the VE's testimony on that basis at the hearing. It is true that, if the basis of a VE's testimony about job numbers is questioned at the hearing, the ALJ must make an inquiry to find out whether the testimony is reliable. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). However, plaintiff has not identified a Seventh Circuit Court of Appeals case holding that plaintiff may raise the issue in the District Court without first having raised it at the administrative hearing.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder*, 529 F.3d at 413. ALJ Janney's decision is supported by substantial evidence, so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Janney committed no errors of law and that his findings are supported by substantial evidence. Accordingly, the final

decision of the Commissioner of Social Security denying William Duren's application for disability benefits is **AFFIRMED.** The Clerk of Court is **DIRECTED** to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATE: March 22, 2018**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**